IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Portland Division

DIANA G. MAIXNER,                          CV 09-261-MA

      Plaintiff,                        OPINION AND ORDER

v.

MICHAEL ASTRUE,
Commissioner of Social
Security,

      Defendant.

DAVID B. LOWRY
9900 S.W. Greenburg Road
Columbia Business Center, Ste. 130
Portland, OR 97223
(503) 245-6309

      Attorney for Plaintiff

DWIGHT C. HOLTON
Acting United States Attorney
ADRIAN L. BROWN
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR  97204-2902
(503) 727-1003

1  - OPINION AND ORDER

LISA GOLDOFTAS
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, WA  98104-7075
(206) 615-3858

    Attorneys for Defendant

MARSH, Judge.

    Plaintiff Diana G. Maixner seeks judicial review of the
final decision of the Commissioner denying her July 15, 2005,
application for disability insurance income benefits (DIB) under
Title II of the Social Security Act, 42 U.S.C. §§ 401-33, and
supplemental security income (SSI) under Title XVI of the Act,
42 U.S.C. §§ 1381-83f.

    Plaintiff was 60 years old on the date of the Commissioner's
final decision.  She seeks DIB and SSI as of September 9, 2002,
claiming impairments of fibromyalgia, post-traumatic stress
disorder (PTSD), generalized anxiety disorder, and possible
multiple sclerosis.  The Administrative Law Judge (ALJ) held a
hearing on March 26, 2008.  On May 29, 2008, he issued a decision
that plaintiff was able to perform past relevant work as a sales
clerk, staff coordinator/personnel scheduler, claims processor,
personnel clerk, administrative assistant, credit card clerk, and
office helper.  Plaintiff timely appealed the decision to the
Appeals Council.  On May 29, 2008, the Appeals Council denied

plaintiff's request for review and, therefore, the ALJ's decision is the Commissioner's final decision for purposes of review.

Plaintiff contends the Commissioner's decision is not supported by substantial evidence and contains errors of law. She seeks an order from this court reversing and remanding the case to the Commissioner to obtain further evidence for the purpose of fully assessing the impact of all of plaintiff's physical and mental impairments on her ability to work.

For the following reasons, the court remands the final decision of the Commissioner for further proceedings to further develop the medical record.

## THE ALJ'S FINDINGS

The Commissioner has developed a five-step sequential inquiry to determine whether a claimant is disabled.  Bowen v. Yuckert, 482 U.S.137, 140 (1987).  See also 20 C.F.R. § 404.1520. Plaintiff bears the burden of proof at Steps One through Four. See Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999).  Each step is potentially dispositive.

At Step One, the ALJ found plaintiff has engaged in substantial gainful activity since the alleged onset of her disability.

At Step Two, the ALJ found plaintiff suffers from severe impairments of fibromyalgia and Raynaud's disease.  See 20 C.F.R. §404.1520(c)(an impairment or combination of impairments is

3  - OPINION AND ORDER

severe if it significantly limits an individual's physical or mental ability to do basic work activities).

At Step Three, the ALJ found these impairments do not meet or equal a listed impairment.

The ALJ found plaintiff has the residual functional capacity (RFC) to perform a full range of light work.

At Step Four, the ALJ found plaintiff is able to perform all of her past relevant work.  Based on this finding, the ALJ did not need to determine whether plaintiff could perform other work.

Accordingly, the ALJ found plaintiff was not disabled and denied her DIB and SSI claims.

## ISSUES ON REVIEW

Plaintiff asserts the ALJ erred (1) in failing to give clear and convincing reasons for rejecting her testimony regarding the nature and severity of her claimed impairments, (2) in failing to give germane reasons for rejecting the lay witness evidence offered by her son and a former employer, (3) in failing (a) to find plaintiff suffers from severe mental impairments including severe depression and a somataform disorder, and (b) to order a psychological functional assessment based on those impairments, (4) in finding that she has the RFC to perform past relevant work, and (5) in posing a hypothetical question to the vocational expert that relied on the ALJ's erroneous RFC finding.

4  - OPINION AND ORDER

**LEGAL STANDARDS**

**Burden of Proof**.

The initial burden of proof rests on the claimant to establish disability.  Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  To meet this burden, a claimant must demonstrate the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g).  "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995).

The court must weigh all of the evidence whether it supports or detracts from the Commissioner's decision.  Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986).  The Commissioner's decision must be upheld, however, even if the "evidence is susceptible to more than one rational interpretation."  Andrews, 53 F.3d at 1039-40.

The Commissioner bears the burden of developing the record. DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991). The duty to further develop the record, however is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001).

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir.), cert. denied, 121 S. Ct. 628 (2000).

"If additional proceedings can remedy defects in the original administrative proceeding, a social security case should be remanded." Lewin v. Schweiker, 654 F.2d 631, 635 (9th Cir. 1981).

## RELEVANT RECORD

**1.   Plaintiff's Evidence.**

Plaintiff's evidence is drawn from disability reports plaintiff completed in January 2005 and February 2005, and her hearing testimony on September 13, 2007.

**a.   Education/Work History.**

Plaintiff attended college for two years. She has no special job training.

For five months in 1996, plaintiff worked for Nike in the human resources department.

From June 1997 to September 2002, plaintiff worked as a disability management specialist processing claims for an insurance company. She quit that job on the recommendation of a doctor because it exacerbated her PTSD and general anxiety disorder. She was also having problems lifting and shelving stacks of files because of fibromyalgia.

Although plaintiff alleges she has been disabled as of September 2002, she worked for four months in 2006 as a customer service representative at a credit card call center during which time she earned $8,700. Plaintiff asserts she was fired from that job because her frequent need to use bathroom facilities interfered with her ability to field as many telephones calls as the job required.

Plaintiff also earned $4,049 in 2005 from her three-month employment as a staffing coordinator for a home health care agency. She left that job because she and her employer "agreed" that she was not able to concentrate and focus on her job tasks.

Plaintiff also worked as a sales clerk at a department store during two holiday seasons in 2005-6.

**b. Physical Impairments**.

In 1975, plaintiff was thrown from her bike and knocked unconscious. Since 2002, she has experienced recurring small tremors three or four times a week during which her head, shoulders, arms, and torso shake. The tremors occur when she is

tense or under stress.  Since 2002, she has experienced an
uncomfortable intermittent sensation of numbness, tingling,
burning, and pins and needles in her legs, buttocks, and thighs,
lasting for a few days and averaging about 10 days a month.

Since 2002, plaintiff has suffered from an overactive
bladder and frequent diarrhea that causes her to go to the
bathroom on average every half hour, adding up to about 80
minutes in an eight-hour workday.

Since 2002, plaintiff has suffered from chronic insomnia and
takes substantial sleep medication to help her sleep.  She now
sleeps 11-12 hours a day and is able to "do stuff" for about four
hours before "being done for the day."  Plaintiff's speed and
pace in completing tasks has been reduced by 25-30 per cent over
the past few years.  She has difficulty on a daily basis, 3-4
times a day, holding her head up, staying awake and/or keeping
her eyes open.  She will fall asleep for five minutes at a time.

Plaintiff has been prescribed Neurontin for a restless leg
with pain which ranges from 4-8 on a scale of 1-10, at which
point she is no longer functional.

Plaintiff has trouble climbing stairs and uses the railing
to pull herself up.  When she does chores, she needs to rest
three or four times during the day for 30-60 minutes. A neighbor
drives her to the store for groceries and helps carry the bags.

Plaintiff estimates she is able to lift up to 5 lbs, stand

for 10-20 minutes, sit for one-half hour before changing position.  She elevates her legs up to the hip position as often as she is able when she sits.

Plaintiff has pain in her hips and thighs.  She is able to bend and stoop at the waist but has difficulty getting back up if she has to crouch, kneel, or crawl.  She also has difficulty reaching her arms in the air and difficulty holding pens because her hand and fingers fall asleep.

**c. Mental Impairments.**

Plaintiff has suffered from depression since 1996.  There are days when she avoids riding light rail public transportation lest she were to throw herself in front of the train.  She cries 3-4 times a week for an average of one hour at a time.

In 2006, plaintiff began having panic attacks during which she has chest pain and difficulty breathing.  Since then, she has taken medication that helps, but she continues to have attacks 5-6 times a month, during which she is unable to function.

Plaintiff is almost always irritable.  Her mood has adversely affected her relationships with others, causing her to isolate and stay at home.  She also experiences exaggerated startle responses two or three times a day.

Plaintiff no longer laughs, has no friends, and prefers not to socialize.  She has cut herself off from most activities and has frequent feelings of guilt and worthlessness.  She has

9  - OPINION AND ORDER

paranoid feelings, which include the sensation of bugs and spiders crawling over her.  She has been prescribed Risperdal, which is an anti-psychotic medication.

Plaintiff has visited a hospital Emergency Department with concerns over her mental health twice before, but not in recent years.

**2.  <u>Lay Witness Evidence</u>.**

**a.  Matthew Bruner.**

Bruner is plaintiff's son.  He sees plaintiff almost every day.  He notices she stumbles, walks really slowly, and needs to rest after walking four blocks.  She has pain in her hands about 40% of the time and has difficulty working in the kitchen.  She is only able to perform routine household chores for up to 20 minutes before taking a break.  She is stressed when her hands hurt.  She forgets what she is about to say and has crying spells about twice a week.  She is angrier and more irritated than in the past.  Such moods last for 40-50 minutes.

**b.  Kathy Carlson.**

Carlson was plaintiff's supervisor when plaintiff worked at the credit card call center in 2006.  She completed a form on which she checked "yes" as to plaintiff's ability to sustain a full day's work without extra periods of rest during a regular work week.  She was unable to determine whether plaintiff's productivity was less than 80% of a normally productive worker,

but she wrote that plaintiff's "production was not satisfactory due to retention issues."  Plaintiff was terminated because she could not perform the essential functions of the job.  Carlson "was not certain" if plaintiff's difficulties in performing her job were "related to illness."

Carlson, however, also checked "yes" to questions asking whether plaintiff's job performance was adversely affected by attention span difficulties, lack of concentration, inability to tolerate job stress, memory difficulties, judgment problems, reliability, inconsistency of performance, quality of work, and slowness.  Carlson did not believe plaintiff's emotional stability, pain, and excessive absences from work were factors in the decision to terminate her employment.  Carlson did not know whether fatigue, lack of stamina, or the side effects of medication, played any role in plaintiff's unsatisfactory performance.

3.  **Medical Treatment Evidence**.

    a.  **Physical Health Treatment Providers.**

The Portland Clinic - Andrea Kielich, M.D. - Internist.
                    - Jerome B. Brem - Rheumatologist.

In October 2000, plaintiff began treating at the clinic for complaints, inter alia, of "Anxiety (Post-Traumatic Stress?), Insomnia, [and] Overactive bladder."  Plaintiff had many complaints of symptoms including shortness of breath, morning

coughing, and fatigue.  "A number of her [] symptoms sound[ed] like fatigue associated with stress and depression."  She was prescribed Paxil and Trazodone.

In November 2000, plaintiff reported the medications made her feel 70% better.

In February 2001, plaintiff complained of generalized fatigue and myalgias.  The Paxil was not working as well.  All tests, however, were normal, leading to an assessment that plaintiff was making "somatic presentations of her [PTSD]."  She was also out of condition because of lack of exercise.

Later that month, plaintiff was seen for diffuse pain related to fibromyalgia.  On examination, however, it was thought "odd" that plaintiff did not exhibit myofascial tight or tender places. The treating physician noted "it is puzzling that her symptoms are so severe and her examination is so benign.  Perhaps we are missing something."

In May and June 2001, plaintiff complained of tingling and numbness in her legs, with pain and hypersensitivity in her arms and legs.  The results of an MRI were normal, with no suggestion of a diagnosis of multiple sclerosis.  It was opined that "most of her symptoms are due to chronic worry and her fibromyalgia."

In July 2001, a study of plaintiff's lumbar spine revealed disk space narrowing with marginal spur formation at L3-4 and narrowing at L4-5.  There was no evidence of bone destruction or

compression fracture.  Dr. Brem diagnosed plaintiff as suffering
from a somatic disorder.

In September 2001, plaintiff continued to complain of low
back pain.  On examination, however, she had good range of motion
of the back and legs, and she had been able to walk on a treadmill
quite rapidly, suggesting she had "routine low back strain due to
lack of exercise."

In August 2007, plaintiff complained of multiple symptoms,
including dysarthria (difficulty talking) and parethesia
(uncomfortable skin sensation, e.g., burning, tingling), which she
thought might be related to multiple sclerosis.  The chart notes
reflect she was also being treated by a psychiatrist at Lifeworks
for depression and a somatic disorder.

Plaintiff was also experiencing "great difficulty sleeping"
and being "very fatigued during the day."  She stated that the
"anti-psychotic" medication she was prescribed helped her.

In October 2007, the results of an MRI to check plaintiff for
signs of multiple sclerosis were normal.

New Horizons - Robert B. Ironsides, M.D. - Internist.

In November 2001, during a physical examination, Plaintiff
described a family history of coronary heart disease and early
death.  She was concerned that pain she felt in her legs was
related to peripheral vascular disease, even though she had
undergone a normal EKG stress test only five months earlier.

On examination, plaintiff exhibited multiple muscle jerks which appeared to be voluntary, in response to deep tendon responses. Plaintiff became upset and insisted the jerks were not voluntary.

In March 2002, plaintiff had multiple complaints, including left knee pain.  Dr. Ironsides found no abnormalities except for plaintiff's wincing.

The Oregon Clinic - Tracy Sax, M.D. - Neurologist.

In May 2002, Dr. Sax examined plaintiff after she complained of graying vision, confusion, and right leg weakness.  Dr. Sax opined plaintiff's symptoms had "some component of anxiety." Nerve studies were "mostly negative."  A brain scan was normal. Plaintiff had mild degenerative disc disease in her lower back.

Legacy Health System - Myron B. Lezak, M.D. - Gastro-
                       enterologist/Internal Medicine.

In July 2002, Dr. Lezak examined plaintiff for abdominal bloating and alternating bouts of constipation and diarrhea over the past 7-8 months.  A colonoscopy confirmed his diagnosis of irritable bowel syndrome and mild internal hemorrhoids.

In January 2003, plaintiff complained of generalized body aching, joint pain, and progressive "Raynaud's" phenomenon. Dr. Lezak diagnosed "probable" fibromyalgia and recommended further evaluation based on the "clear-cut Raynaud's phenomenon." After further evaluation, Dr. Lezak diagnosed plaintiff's symptoms as "related to reactive vasculature and probable fibromyalgia."

Providence St. Vincent Medical Center Emergency Room.

In August 2002, plaintiff was treated after she was punched by her oldest son several times when he became confused after taking plaintiff's sleep medication.  Plaintiff suffered painful bruises and swelling but was discharged in good condition.

In October 2003, plaintiff was treated after she complained of two episodes of chest pain within two days.  The results of an electrocardiogram were normal with no objective evidence of heart disease.  The pain was attributed to stress.

b.  Mental Health Treatment Providers.

Carla Dorsey, M.D. - Psychiatrist.

In September 2001, plaintiff described "not having a good life," "trying to cope" and "not expect[ing] a quick fix."  She suffered from major depression six years earlier.  She complained that her energy level was "not good," she had no appetite, her thoughts were "scary," and her memory was not good.  She was taking Paxil to better control her panic attacks.

In May 2002, plaintiff stated she was depressed and that something was medically wrong because she had spells when she woke up and could not see clearly.  She had not gone to work for 2-3 weeks.  She could not think clearly or finish a sentence and would lay in bed until 3:00 p.m.  She had leg pain issues similar to those she experienced six years earlier. She felt her "skin [was] paper thin" with "hardly anything protecting [her] nerves," and

15 - OPINION AND ORDER

that "slivers and fleas [were] trying to bite" her.  She was again
concerned that she might hurt herself.  She was becoming more
withdrawn and did not want to go out in public.  She sometimes did
not take a shower.  She was still suffering from pain and thought
she had lupus, although no doctor would listen.  She had pain in
her legs and headaches with shooting, burning pain from her upper
brow through her scalp.

     In June 2002, plaintiff described being angry at her doctor,
Dr. Ironsides, because after she complained of a lump and pain in
her leg, he told her "everybody gets that, it just happens" and
plaintiff's complaints were psychosomatic.  During the session,
she focused on somatic symptoms, was suspicious of doctors, and
was difficult to redirect.  Plaintiff was stressed because she
was unable to make decisions, was tired because of lack of sleep
at night, and had no sense of accomplishment.  Dr. Dorsey opined
plaintiff suffered from a "still unclear probable anxiety variant"
with "somatoform complicators."

     In July 2002, plaintiff was feeling better after taking
Neurontin but she remained preoccupied with her physical ailments
and was difficult to redirect.  Her anxiety level was moderate.
She stated she needed to return to work as a claims processor in
order to keep her job, although she was fearful of the physical
demands of the work.  Later that month, she returned to work and
was less preoccupied and irritable.

16 - OPINION AND ORDER

<u>LifeWorks N.W. - Cynthia Romero, M.D. - Psychiatrist,</u>
              <u>- Jonathan Betlinski, M.D. - Psychiatrist,</u>
              <u>- Jan DeRoest, Psy.D, - Psychologist</u>.
              <u>- Laura Mansfield, M.A.</u>

In April 2006, Plaintiff was referred for counseling by the Washington County crisis line because she had suicidal thoughts. In her intake interview, plaintiff stated that her sons and mother relied on her to take care of them but nobody was taking care of her. She was experiencing symptoms of anxiety including nerves "on the surface," and an inability to tolerate sounds, learn new things, or concentrate. She had been chronically depressed for a year and was depressed off and on before then. She previously sought mental health counseling and found it helpful, but stopped after she was laid off from her job.

Plaintiff's diagnosis was Major Depressive Episode, Single, general anxiety disorder, and PTSD by report, with psychosocial stressors relating to family relationships and financial/job issues. Her GAF score was 55 (moderate difficulties in social, occupational, or school functioning).

<u>Cynthia Romero, M.D.</u>

In May 2006, Dr. Romero began treating plaintiff. Plaintiff reported a long history of depression with PTSD symptoms. She described a family history that included two sons, aged 26 and 32, both of whom were either schizophrenic or schizoaffective. The older son had a violent temper. Her ex-husband was an abusive alcoholic. Dr. Romero diagnosed Major Depressive Disorder,

17 - OPINION AND ORDER

recurrent, moderate, with a GAF score of 55.

In June 2006, plaintiff called Dr. Romero and informed her she was no longer interested in counseling but wanted to continue her medications. She missed a scheduled appointment, but a week later saw Dr. Romero for purposes of medication management. Plaintiff reported doing better with Lexapro, but she still had a lot of anxiety. Her affect was normal, and her speech was coherent. Her mood was 6 on a 1-10 scale.

In April and June 2007, Plaintiff missed two scheduled appointments. In July 2007, she reported feeling depressed again and had stopped taking antidepressant medication. She wondered whether she had multiple sclerosis.

<u>Jonathan Betlinski, M.D.</u>

In August 2006, Dr. Betlinski began treating plaintiff. She was feeling better and wanted to live. She was hyperattentive, however, with an exaggerated startle response. She was still sleeping poorly. Although she was somewhat anxious, her thoughts were relevant, rational, and goal directed. Her GAF score remained at 55.

In December 2006, plaintiff continued a trend of gradual improvement. She was able to work. Her risk of harm to herself or others was low. She was, however, still hyperattentive with an exaggerated startle response. Her GAF score again remained at 55.

In January 2007, plaintiff reported that she lost her job

because she had difficulty retaining new information.  She was
depressed and anxious.  Her thoughts, however, were relevant,
fairly rational, and goal-directed.  Her insight and recall were
good, and her judgment was fair.  Her GAF score remained at 55.

In March 2007, plaintiff was concerned over finances and had
lost her health insurance.  Her mood was "stressed," her affect
was somewhat anxious, with an appropriate range of reactivity.
Her thoughts remained relevant, rational, and goal-directed.
Her depression and PTSD, however, were "deteriorating with greatly
increased life stressors."  Her GAF score decreased to 50 (serious
impairment in social, occupational, or school functioning).

Jan DeRoest, Psy.D. - Psychologist.

In April 2007, Dr. DeRoest began seeing plaintiff.  She
thought plaintiff would benefit from "catharsis with empathic
listening at first" and "frequent visits to monitor her
suicidality."  She also thought plaintiff might benefit from
"cognitive restructuring as she feels she is currently in an
intractable situation that is hopeless."

In September 2007, plaintiff reported she was "overwhelmed to
the point of mental paralysis" because of the needs of those
around her.  She was working on paperwork to apply for social
security benefits for her schizophrenic son and for herself, based
on "her multiple sclerosis."

19 - OPINION AND ORDER

Laura Mansfield, M.A.

In December 2007, at the request of plaintiff's counsel, Laura Mansfield, M.A., completed a questionnaire in which plaintiff's highest GAF that year was 55, her current GAF was 50, and her lowest GAF was 40, reflecting a range of functioning from moderate symptoms - major impairment.  Mansfield indicated that plaintiff was not a malingerer.  She checked some boxes reflecting plaintiff's symptoms but did not check boxes that specifically addressed potential workplace limitations.

5.  **Medical Examination Evidence.**

    **a.  Physical Health Examiner.**

    Tatsuro Ogisu, M.D. - Physical Medicine and Rehabilitation.

    Plaintiff "self-diagnosed" herself as having multiple sclerosis for 25 years.  During the examination she was anxious but cooperative, and she made a good effort on exam.  Although plaintiff raised the "question of multiple sclerosis," it was a "self-diagnosis based on myriad symptoms," and a "lateralization of findings" on the left side of the brain "were not entirely physiologic," i.e., normal.  Dr. Ogisu raised "the possibility of a somatization disorder."  Nevertheless, he recommended further "imaging studies."

    Based on his examination, Dr. Ogisu opined plaintiff should be able to sit or stand for 6 out of 8 hours, and lift up to 25 lbs occasionally and 10 lbs frequently.

6.  **Medical Consultation Evidence**.

    a.  **Physical Health Consultants**.

    Martin Kehrli, M.D. - Internal Medicine.

    In October 2005, Dr. Kehrli reviewed plaintiff's medical records and opined plaintiff was able to lift 20 lbs occasionally and 10 lbs frequently, sit and/or stand for six hours in an eight-hour workday, with an unlimited pushing/pulling ability.  The only postural limitations related to plaintiff's ability to balance and stoop only occasionally.  Dr. Kehrli concluded plaintiff's claimed limitations as to poor memory, walking crookedly, "heavy legs," and bowel incontinence, were not supported by medical findings.

    Richard Alley, M.D.
    Michael W. Carte, M.D.

    In March 2006 and November 2007 respectively, Dr. Alley and Dr. Carte reviewed plaintiff's medical records and agreed with Dr. Kehrli's conclusions as to plaintiff's physical limitations.

    b.  **Mental Health Consultants**.

    Robert Henry, Ph.D. - Psychologist.
    Bill Hennings, Ph.D. - Psychologist.

    In October 2005 and March 2006 respectively, Dr. Henry and Dr. Hennings reviewed plaintiff's medical records and opined that plaintiff suffers from non-severe anxiety, with mild restrictions in daily living activities and mild difficulties in maintaining social functioning  and concentration, persistence, or pace.

21 - OPINION AND ORDER

Maximo J. Callao, Ph.D.

In November 2007, Dr. Callao reviewed the same records and concluded plaintiff suffered from non-severe anxiety and PTSD, resulting in a mild restriction in daily living activities.

### DISCUSSION

### 1. Rejection of Plaintiff's Evidence.

Plaintiff contends the ALJ erred in failing to give clear and convincing reasons for rejecting her testimony regarding the nature and severity of her claimed impairments.

A claimant who alleges disability based on subjective symptoms "must produce objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged. . . .'" Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir. 1991) (quoting 42 U.S.C. § 423(d)(5)(A) (1988)).  See also Cotton v. Bowen, 799 F.2d 1403, 1407-08 (9th Cir. 1986).  The claimant need not produce objective medical evidence of the symptoms or their severity.  Smolen v. Chater, 80 F.3d 1276, 1281-82 (9th Cir. 1996).

If the claimant produces objective evidence that underlying impairments could cause the pain complained of and there is not any affirmative evidence to suggest the claimant is malingering, the ALJ is required to give clear and convincing reasons for rejecting plaintiff's testimony regarding the severity of her symptoms.  Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).

See also Smolen, 80 F.3d at 1283.  To determine whether the claimant's subjective testimony is credible, the ALJ may rely on (1) ordinary techniques of credibility evaluation such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms, and other testimony by the claimant that appears less than candid; (2) an unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment; and (3) the claimant's daily activities.  Id. at 1284 (citations omitted).

Here, there is no evidence that plaintiff is malingering and the ALJ found plaintiff's medically determinable impairments could reasonably be expected to cause some of her symptoms.  The ALJ, however, also concluded plaintiff's description of the "intensity, persistence, and limiting effects" of her symptoms was not credible because plaintiff "somatizes tremendously."  The ALJ noted Dr. Ironside's report that the majority of plaintiff's symptoms were "psychosomatic."  The ALJ also noted much of the other medical evidence referred to plaintiff's unyielding belief that she suffered from multiple sclerosis, including Dr. Ogisu's reference to plaintiff's "self-diagnosis" of multiple sclerosis "based on myriad symptoms over the years," and Dr. Takano's report that plaintiff "had a lot of somatic symptoms, which [plaintiff] apparently attributed to multiple sclerosis."  As a result, the

23 - OPINION AND ORDER

ALJ not surprisingly noted objective medical findings in many instances did not support the severity of the symptoms as described by plaintiff.

In addition, without elaboration, the ALJ noted plaintiff was a full-time caregiver to her adult son who suffers from schizophrenia, and her daily living activities, which included driving, shopping, reading, managing money, and attending church, were inconsistent with the level of disability she claims.

For the following reasons, I conclude the ALJ did not give clear and convincing reasons to support his finding that plaintiff was not a credible witness.

Plaintiff's Somatization.

"If [a condition] is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Carradine v. Barnhart, 360 F.3d 751, 754 (7th Cir. 2004). See also Day v. Astrue, No. 08-944-JE, 2010 WL 331777 at *14 (D. Or. Jan. 22, 2010)("Those suffering from a somatoform disorder experience physical symptoms for which there are no demonstrable organic findings, and which are presumed to be linked to psychological factors.").

The fact that plaintiff is diagnosed with a somatoform disorder which may cause her to exaggerate the severity of all or some of her physical symptoms is not a reason in and of itself for the ALJ to reject her subjective complaints as incredible.  The

lack of such findings is a hallmark of a somatoform disorder and not a clear and convincing reason to reject her testimony.

Daily Living Activities.

Plaintiff stated she cooks simple dinners and does not make breakfasts or lunch because she is unable stand in the kitchen for long periods. She has two sons who take care of themselves even though one of them is schizophrenic. She can stand 2 or 3 hours before needing to rest. She does no ironing because the iron is too heavy. She is able to dust the apartment slowly and can vacuum one room at a time with a rest in between rooms. She has difficulty stepping on a chair, lifting, standing, or carrying anything for longer than 10 minutes. She is too tired and weak to do yardwork.

Plaintiff uses public transportation and sometimes her neighbor drives her to the store to buy groceries. She is able to shop if she holds onto the cart. Her neighbor lifts and carries the shopping bags. She does all her daily activities "in small doses." She is able to read for short periods of time until her eyes get blurry. Her major social activity involves attending church services 1-2 times a week.

On this record, I conclude the ALJ did not give clear and convincing reasons for finding plaintiff's self-described daily living activities are inconsistent with her purported inability to work.

25 - OPINION AND ORDER

Accordingly, I conclude the ALJ erred in failing to credit plaintiff's evidence regarding her perception of both the extent of her alleged infirmities and the physical limitations associated with them.

**2.    Rejection of Lay Witness Evidence.**

Plaintiff contends the ALJ failed to give germane reasons for rejecting the lay witness evidence offered by her son and a former employer.

Lay witness evidence as to a claimant's symptoms "is competent evidence that an ALJ must take into account" unless he "expressly determines to disregard such testimony and gives reasons germane to each witness for doing so." <u>Lewis v. Apfel</u>, 236 F.3d 503, 511 (9th Cir. 2001).

**a.    Plaintiff's Son.**

Plaintiff's son testified as to plaintiff's physical limitations and moods.  The ALJ rejected his evidence because "[he] does not provide objective support for limitations.  He just described his perceptions of her behavior."  The Commissioner argues that because the son only "described actions that were under [plaintiff's] control," and the plaintiff was not credible, the ALJ, therefore, gave a germane reason for not accepting the son's evidence.

As set forth above, however, the ALJ did not give clear and convincing reasons for rejecting plaintiff's evidence based on her

lack of credibility and, therefore, he could not rely on that lack of credibility to bolster his rejection of her son's evidence.

**b. Kathy Carlson.**

The ALJ rejected evidence presented by plaintiff's supervisor that plaintiff was terminated from her credit card call center job in 2006 because plaintiff's "production was not satisfactory due to retention issues" and she could not perform the essential functions of the job. Carlson, however, also checked "yes" to questions asking whether plaintiff's job performance was adversely affected by attention span difficulties, lack of concentration, inability to tolerate job stress, memory difficulties, judgment problems, reliability, inconsistency of performance, quality of work, and slowness.

The ALJ rejected this evidence because Carlson was not a medical expert and Carlson was uncertain whether plaintiff's difficulties at work related to her illness.

A lay person who is "not a vocational or medical expert" may offer an opinion as to how an employee's "condition affects [her] ability to perform basic work activities." See Bruce v. Astrue, 557 F.3d 1113, 1116 (9th Cir. 2009), citing 20 C.F.R. § 404.1513(d)(4)(evidence provided by lay witnesses may be used to show the severity of [a claimant's] impairment(s) and how it affects [the claimant's] ability to work).

Here, Carlson, as plaintiff's work supervisor, witnessed

27 - OPINION AND ORDER

plaintiff's job performance on a daily basis and, therefore, was qualified to offer her opinion that plaintiff's job performance was adversely affected by lack of concentration, lack of judgment, poor memory, and other non-physical impairments. That opinion was not a medical opinion. The ALJ, therefore, did not give a germane reason for rejecting Carlson's testimony.

**c.  The ALJ's Error Was Not Harmless.**

The Commissioner contends the ALJ's rejection of the above lay evidence was "inconsequential to the ultimate disability determination" and therefore was "harmless."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008). I disagree. For the reasons set forth below, I conclude the ALJ erred in failing to find plaintiff suffers from severe mental impairments that include severe depression and a somataform disorder. In addition, his rejection of the lay evidence that addressed, inter alia, plaintiff's manifestation of those mental impairments, was a factor in his ultimate finding as to their severity and, therefore, was not harmless.

**3.  Failure to Find Severe Mental Impairments.**

Plaintiff contends the ALJ erred by failing to provide an adequate assessment of plaintiff's mental impairments relating to depression and somataform disorder and in not ordering a psychological assessment of her ability to function in light of those impairments. I agree.

28 - OPINION AND ORDER

The medical evidence amply reflects and the ALJ found plaintiff suffers from a somatoform disorder, anxiety, and depression.  As noted, the ALJ found plaintiff's anxiety and depression were non-severe, and he considered her somatoform disorder not as a workplace limitation but as a factor adversely affecting her credibility.  In addition, the ALJ improperly rejected the lay witness evidence of a former employer who observed the adverse impact of plaintiff's mental impairments on her ability to work and apparently terminated plaintiff's employment as a result.

Based on the above, I conclude the medical record is not fully developed.  In particular, it is at least ambiguous as to the impact of plaintiff's somatoform disorder, depression, and anxiety on her ability to work.  In the absence of a fully developed record, I conclude any determination as to whether plaintiff can perform either her past relevant work or other work is premature.  Moreover, the record is insufficient to allow for the framing of an adequate hypothetical to a vocational expert as to that issue.

**4.    Remand.**

In light of the above, I conclude this matter should be remanded to afford the Commissioner the opportunity to conduct a psychological examination and evaluation of plaintiff's mental impairments relating specifically to her diagnoses of somatoform

disorder, depression, and anxiety, and the extent to which those impairments limit her ability to engage in substantial gainful activity.  <u>Lewin v. Schweiker</u>, 654 F.2d at 631.  In so doing, the Commissioner shall reevaluate plaintiff's credibility in light of the psychological evaluation and reassess the value of the lay witness evidence presented by plaintiff's son and former work supervisor in light of the psychological evaluation.

<u>**CONCLUSION**</u>

For the reasons stated above, the Commissioner's final decision denying benefits to plaintiff is **REMANDED** for further proceedings as set forth herein.

IT IS SO ORDERED.

DATED this 21 day of April, 2010.


    /s/  Malcolm F. Marsh
MALCOLM F. MARSH
United States District Judge

30 - OPINION AND ORDER